Nott, J.,
delivered the opinion of the court:
This is an action brought to recover a balance of $7,293 34 for army clothing sold to the defendants at St. Louis, in 1861.
The case is one of that class which illustrates how a few public officers may drive from the governmental market all respectable contractors, and bring upon the government that subsequent penalty which all governments must sooner or later pay for faith broken with their contractors. The evidence here shows that in the stormy months of September and October, 1861, Messrs. Livingston, Bell & Co., the claimants, having credit with the manufacturers of army clothing in New York, which, the evidence shows, the government had not, were solicited to furnish clothing to the quartermaster department at St. Louis. They did so ; and their sales, consisting in part of four several bills of goods, beginning on the 24th of September and ending on the 10th of October, amounted in the aggregate to the sum of $107,293 34. The first of these bills was approved by Major McKinstry, chief quartermaster of the department, and the three others by his successor, General Robert Allen. The goods furnished in all the bills were the same in kind, quality,' and price.
At that time the quartermaster of the department-was without money to pay for these goods, and subsequently the well known “Davis-Holt-Oampbell commission” was appointed by the War Department to examine certain claims arising under the administration of General Frémont. The claimants’ belonged to that class, and they were accordingly compelled to submit their vouchers to the commission.
The proceedings before the commission may be briefly told in the words of one of the claimants, who was examined as a witness in the ease, and as the solicitor has not called any member of the commission nor any other witness to contradict this statement we must conclude that it is substantially true, and that the evidence of the commissioners themselves would be injurious to the government if given in a court of justice, and applied to the case under the ordinary rules of law.
*134 The claimant, Livingston, testifies :
“After having retained my vouchers for a great length of time, 1 was summoned to appear before that commission and make my statement to them concerning these vouchers; I did so appear and sustain my claim in such manner that the said commissioners declined receiving any further testimony in the case, saying to me that my statement was satisfactory, and that they did not think they needed any further testimony. After some time I was again summoned before the commissioners, and it was then stated to me that there was a deduction made upon my vouchers of $7,293 34, being all in excess over $100,000; I then and there demanded of the commission my four vouchers presented to them; they refused to give up the vouchers, and stated that unless I would take $100,000 and sign a receipt in full for the entire claim, I could- not have any portion of it, or the vouchers in return, which I then refused to do ; I then examined the vouchers and found that the $7,293 34 was deducted from the voucher approved by Major J. McKinstry, which called for $35,954 79 ; that said voucher was obliterated and defaced with red ink; that the other three vouchers, which Major Robert Allen approved for the same kind ■of goods in quality and price, were clear and undefaced as when I delivered, them to the said commission; I then demanded the three last-named vouchers from the said commission, stating that I would fight the government on the McKinstry voucher; they refused to deliver all or any portion of the vouchers to me, and they refused payment upon them unless I would accept $100,000 in full payment, and sign a receipt therefor for the total amount of said four vouchers; owing to pecuniary embarrassments which were then pressing me almost to a failure, I did accept the sum of $100,000 so mentioned, under a protest, and signed a receipt therefor, believing that at some future time 1 would recover the balance from the government, and in order to protect my notes from 'protest, and my business from failure.
“The $100,000 was paid to me in certificates of indebtedness, which I was afterwards compelled to sell at a discount.”
And to this he adds :
“ The vouchers were issued to me for goods furnished as stated in the vouchers, and I continued to furnish immediately after the date of said vouchers the same kind of goods as mentioned in said vouchers, botlj in quality and price, to Major Robert Allen, quartermaster United States army, and for which I received payment in full of Quartermaster *135 General M. C. Meigs, at Washington city, to the amount of $74,000 in one instance.”
Upon these facts (and they are not controverted) it is difficult to even suggest a valid ground upon which to rest a defence to this action. If the objection be made that the sale was invalid for want of previous advertisement, or because no “ exigency” existed within the intent of the statute, (2 March, 1861; 12 Stat. L., p. 220,) or for the reason that the goods were not purchased in open market; and if the court should so hold,.yet still it would appear that the defendants received the claimants’ goods, that these were sold in good faith, that they went into the hands of the proper officers of the government, and were used in the public service, and that from, their receipt a public benefit was derived; and these facts being established, there would follow a legal right to recover a just and reasonable price, under the rulings of this court in the Frémont Contract cases, (2 C. Cls. R., p. 1.) Nor would the measure of damages on quantum valebant be different, for where the parties through a series of sales have paid and received a uniform price for the same goods, and where a high officer of the government, charged with the responsibility and supervision of such matters, as is the Quartermaster General, has given his sanction to the transaction by paying the same price for the same goods, to the same party, it is certainly sufficient evidence prima facie that the goods in the disputed bill were worth the price charged.
Assuming, then, what has hardly been disputed, that the sale was in one form or the other valid, either as an express or implied contract, the only remaining questions that could be made would arise from the act of the military commission in deducting from the first voucher the amount sought to be recovered in this action, and from the claimants’ having signed a receipt in full. But these questions, and in a much stronger form, have been sufficiently discussed in the Fremont Contract cases, (2 C. Gis. B,., p. 1,) and in the case of Theodore Adams, (id., p. 70.) The doubts which the court might have felt in those cases could hardly exist here. No reason is shown why the commission should have reduced the first voucher and have allowed the others to' stand untouched. If the object was in this indirect way to cut down the total amount from $107,293 34 to the even sum of $100,000, it was an exercise of power in no manner authorized or suggested by their .instructions. And if the commission had been authorized by the Secretary of War to make the reductions, which it was not, then the course that the claimants sought to follow would have been right and proper. Nothing could be more fair or just than that parties thus cjr- *136 cumstanced should receive back their undisputed vouchers, and leave the one that was the subject of dispute for future adjustment or controversy. The withholding of the vouchers that were not a subject of controversy until the claimants should accede to the reduction of the one which was disputed, and especially withholding them when the claimants offered to allow the disputed one to remain in the defendants’ possession, is a clear case of duress of goods, and renders -the instrument thus procured illegal and void.
The judgment of the court is that the claimants recover $7,293 34.